**Mark HUGHES et al.**

**v.**

**BETA UPSILON BUILDING
ASSOCIATION.**

Supreme Judicial Court of Maine.

Argued Sept. 8, 1992.

Decided Jan. 20, 1993.

Julian Sweet (orally), David J. VanDyke, Berman & Simmons, Lewiston, for plaintiffs.

George C. Schelling (orally), Gross, Minsky, Mogul & Singal, P.A., Bangor, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD and COLLINS, JJ.

ROBERTS, Justice.

Plaintiffs Mark and Mary Hughes appeal from a summary judgment entered in the Superior Court (Penobscot County, *Smith, J.*) in favor of the defendant, Beta Upsilon Building Association, on their complaint for negligent injury to Mark Hughes. The Hugheses contend that there exists a genuine issue of material fact concerning the Association's ability to control the activities of Mark's fraternity. Because the power to control does not necessarily create a duty to control, we affirm the judgment.

I.

The following facts were developed for the purposes of the defendant's motion for a summary judgment. Mark Hughes was a member of the Beta Upsilon Chapter of the Alpha Tau Omega Fraternity at the University of Maine in Orono. He attended meals, meetings, and social events, but did not live in the fraternity house. The Maine Beta Upsilon Building Association owned the building that housed the local chapter of ATO ("chapter house") and the surrounding grounds. The Association consisted of university graduates who were members of ATO as undergraduates. The Association rented all of the real estate, i.e., the chapter house and grounds, to the local chapter pursuant to an oral agreement.

On September 24, 1983, ATO sponsored a mud football game on the fraternity grounds, an annual event. The ATO members prepared the field for the game by flooding a bermed area in the back of the chapter house and driving a four-wheel drive vehicle back and forth across the flooded area until mud was created. In

1983 the mud football game was held on Parents Weekend. Although this particular event had previously been held on Homecoming Weekend, the Association rescheduled the game for Parents Weekend so it would not interfere with the alumni fund-raising that traditionally occurs on Homecoming Weekend. The 1983 mud football event consisted of a full contact football game between two sororities and then a second football game between ATO and the Orono chapter of Alpha Gamma Rho. No one wore pads, helmets, or any equipment.

Mark Hughes, a spectator rather than a player, was injured at some point shortly after the fraternity game began. For unexplained reasons, Hughes walked to the edge of the playing field, stood on the berm surrounding the field for a few moments, and then dove headlong into the muddy field. As a result Hughes suffered a broken neck and spinal injuries, leaving him a quadriplegic. Hughes was twenty-two years old at the time.

On the day of the mud football game in 1983, alcohol was being served at the chapter house, at least to ATO members. Not only were there no strict rules of play for the game, there were no restrictions on consumption of alcohol by the players. In fact, the events of the day were intricately tied to the consumption of alcohol. It is undisputed, however, that Hughes was not intoxicated at the time of his injury.

Although the Association's relationship with ATO was that of landlord and tenant, the Association was more intricately involved with the activities of ATO than a typical landlord. The Association members were active alumni and were privy to reports that the chapter advisor prepared for the national organization. The Association was notified by the chapter advisor of potential problems with the ATO undergraduates, such as over-consumption of alcohol. Moreover, it was the Association's duty to insure that the undergraduate ATO members did not violate state or university regulations. As such, it answered questions for the undergraduates and dealt with the fraternity liquor policy. According to the national fraternity organization, the Association was in a position to influence the undergraduate fraternity members positively and, depending on the situation, to supervise and control the undergraduate members and to impose certain requirements.

## II.

The Hugheses brought a personal injury action against the Association, seeking damages for the alleged breach of its duty "to use reasonable care and provide a reasonably safe premises" and the alleged breach of its duty "to warn invitees of the dangers associated with the activities conducted on the premises." The Association moved for a summary judgment on the ground that as a landlord it was not responsible for undergraduate activities. The Hugheses appeal from the ensuing summary judgment in favor of the Association.

The trial court concluded that there was no dispute as to any material fact and that the Association was entitled to a judgment as a matter of law. We have recognized that a "summary judgment is an extreme remedy which should be cautiously invoked." *Utica Mut. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 468 A.2d 315, 317 (Me.1983). "It is specifically reserved for those occasions on which the facts before the court so conclusively preclude a party's recovery that a judgment in favor of the party is the only possible result." *Id.* at 317. When reviewing a summary judgment we view the evidence in the light most favorable to the party against whom the motion has been granted and accord that party the full benefit of all favorable inferences that may be drawn from the evidence. *Philbrook v. Gates Formed-Fibre Products, Inc.*, 536 A.2d 1118, 1119 (Me.1988); *Hankard v. Beal*, 543 A.2d 1376, 1377 (Me.1988). The trial court's conclusions are reviewed for error of law. *St. Louis v. Hartley's Oldsmobile–GMC, Inc.*, 570 A.2d 1213, 1215 (Me.1990).

■ We are not confronted with a claim against a possessor of real estate for an alleged dangerous condition. Nor are we

confronted with a claim against a landlord for an alleged latent defect. Instead, the Hugheses contend that the Association had the ability to control activities on the fraternity's property. As a result, they argue, the Association had a duty to prohibit an activity of which it had knowledge and that they contend was inherently dangerous. Consequently, the Hugheses argue that a genuine issue of material fact exists concerning the extent of the Association's control over the mud football game. We disagree that any material fact issue remains unresolved.

▉ There can be no dispute on the record before us that the Association has and exercises control over fraternity activities. Conceding that, however, does not mean that the Association acts as a protector of the welfare of adult fraternity undergraduates. Obviously a duty to control an activity cannot arise when there is no ability to control, but the converse is not necessarily true. The mere ability to control does not give rise to a legal duty. *See* F. Harper, F. James & O. Gray, *The Law of Torts* § 18.6, at 718 (1986) [hereinafter *Law of Torts*].

▉ Unlike the hospital in *Baker v. Mid Maine Medical Center*, 499 A.2d 464 (Me.1985), the Association had no active role in the event at issue. The Hugheses charge the Association with nonfeasance rather than misfeasance. The Association's nonfeasance cannot render it liable, however, unless it had a duty to act affirmatively to protect Hughes from a danger it had not created. *Prosser and Keeton on Torts* § 56, at 373 (1984). Such a duty does not arise from the opportunity to control the activity. It arises only from a relationship that society recognizes as sufficient to create the duty. Just as control and foreseeability are factors in a duty analysis, so is the relationship of the parties. Not all relationships create an affirmative duty to act. *See, e.g., Howe v. Stubbs*, 570 A.2d 1203 (Me.1990) (store owner under no duty to warn customer of potential harm, although foreseeable); *Law of Torts* § 18.6, at 718, *Restatement (Second) of Torts* § 314 & comment c (1965) (one may have the power, without risk to himself, to prevent foreseeable harm not of his making, but may refrain from intervention with impunity). We conclude that the record before us establishes that the Association had no duty to take affirmative action to prevent harm to Hughes from his participation in an activity that it did not sponsor, despite the Association's ability to influence the activities of the fraternity.

The entry is:

Judgment affirmed.

All concurring.