SUPERIOR COURT
PENOBSCOT, SS.

CIVIL ACTION
Docket No. CV-02-74
JLH - PE - ...

Larkin Enterprises, Inc.,
   Plaintiff

v.

Order on Motion to Dismiss

FILED & ENTERED
SUPERIOR COURT

SEP 13 2002

PENOBSCOT COUNTY

DONALD L. GARBRECHT
LAW LIBRARY

SEP 17 2002

Manafort Brothers, Inc. et al.,
   Defendants

Pending before the court is the motion to dismiss filed by defendant Maine Yankee Atomic Power Company. The court has considered the written arguments submitted by Maine Yankee and the plaintiff.

Maine Yankee argues that the allegations asserted against it in the complaint fail to state a claim upon which relief could be granted against it. "A motion to dismiss tests the legal sufficiency of the complaint." *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994). On a motion to dismiss, the complaint must be examined "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* A dismissal is proper "only when it appears beyond doubt that a plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim." *Hall v. Board of Environmental Protection*, 498 A.2d 260, 266 (Me. 1985). *See also Heber v. Lucerne-in Maine Village Co.*, 2000 ME 137, ¶ 7, 755 A.2d 1064, 1066.

In its complaint, Larkin alleges that as Maine Yankee decommissioned its nuclear power plant in Wiscasset, it hired defendant Manafort Brothers, Inc. to conduct part of that project. Complaint at ¶¶ 5-6 and 8. Maine Yankee prepared technical specifications, design criteria, drawings and listed suppliers, which Manafort used in securing bids from potential subcontractors. *Id.* at ¶¶ 10-11 and 13. Manafort provided this information to Larkin. *Id.* at ¶ 10. In response to further inquiries from Larkin, Manafort advised Larkin that the subcontractors' work was to be performed as "occurring in a standard

1

commercial setting." *Id.* at ¶¶ 14-15. In formulating its fixed bid prices, Larkin relied on this information, and Manafort accepted Larkin's bids. *Id.* at ¶¶ 16-18. Larkin mobilized to the project and began its work, which included the submission of drawings and material submittals required by the specifications that previously were provided to it. *Id.* at ¶¶ 20-21. However, Larkin's submittals and drawings were rejected, and, as Manafort acknowledged, the project work environment was not a "standard commercial setting." *Id.* at ¶¶ 22-24. Further, after Larkin mobilized to the site, it discovered that the specifications and drawings provided by the defendants were seriously flawed. *Id.* at ¶ 26. As a result of the flawed drawings and specifications, Larkin incurred significant expense exceeding that contemplated on the basis of the original proposals identified by the defendants, and the length of time required for performance was dramatically increased. *Id.* at ¶¶ 27-28. Nonetheless, Larkin and Manafort proceeded with the project in a commercially reasonable manner, and Larkin has completed its performance. *Id.* at ¶¶ 29-30. Maine Yankee has made "progress payments" to Manafort. *Id.* at ¶ 47.[1] Larkin alleges that Manafort has failed to pay it in full. *Id.* at ¶ 31. Larkin now seeks damages from both defendants.

In addition to claims it has asserted against Manafort, Larkin alleges that Maine Yankee is liable under theories of unjust enrichment (count 1), quantum meruit (count 2), negligent representation (count 3), wrongful refusal to approve submittals (count 5) and breach of warranty (count 6). In the motion at bar, Maine Yankee seeks dismissal of each of these counts as stated against it.

**Unjust enrichment (count 1)**

After years of confusion by the bar, *see Bowden v. Grindle*, 651 A.2d 347, 350 (Me. 1994), and the Law Court's acknowledgement that it had not been precise in its nomenclature, *see Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269, 271 n. 3 (Me. 1998), *Danforth v. Ruotolo*, 650 A.2d 1334, 1335 n. 2 (Me. 1994), recent caselaw has carefully identified the elements of an unjust enrichment claim and distinguishes such a claim from one for quantum meruit, discussed below. A claim for unjust enrichment is predicated on evidence that the plaintiff conferred a benefit on the defendant, that the

---

[1] Maine Yankee argues that, based on the complaint, it has fully paid Manafort. This construction is not supported by the allegations in the complaint.

2

defendant had an appreciation or knowledge of that benefit, and that the defendant's acceptance or retention of that benefit makes it inequitable for the defendant to retain that benefit without payment for its value. *Forrest Associates v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 14, 760 A.2d 1041, 1045-46. Maine Yankee argues here that as a matter of law, it is not liable to Larkin because the two did not stand in a relationship of contractual privity.

In a case that predated the Law Court's efforts to eliminate the intermingled analysis of unjust enrichment and quantum meruit claims, it held that "[l]ack of privity of contract . . . do[es] not bar an action for unjust enrichment." *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 610 A.2d 747, 749 (Me. 1992). For several reasons, it is apparent that, in that passage, the Court in fact was examining the law of unjust enrichment and was not using that term in discussing the substance of quantum meruit claims. First, that holding falls squarely within the context of the analysis of a claim that is defined by the elements of unjust enrichment and not the different elements of a claim for quantum meruit. *See id.* Second, the following sentence, which is a quotation from *Pendleton v. Sard*, 297 A.2d 889 (Me. 1972), refers to the claim of a party whose labor or materials result in a benefit to another party. The receipt or acceptance of a benefit is at the heart of a claim for unjust enrichment and in fact serves to distinguish it from a claim for quantum meruit: in the former, the measure of damages is based "on the value of what was inequitably retained"; and in the latter, the measure of damages is the value of the services rendered. *Paffhausen*, 1998 ME 47, ¶ 7, 708 A.2d at 271.

In *A.F.A.B.*, the Law Court went on to hold that a plaintiff/subcontractor may properly pursue an action for unjust enrichment against the defendant/property owner, even in the absence of privity of contract with the defendant, when the defendant has not paid the general contractor in full. 610 A.2d at 749. Here, the allegations in the complaint do not establish that Maine Yankee has paid Manafort in full. Rather, the plaintiff alleges only that Maine Yankee has made progress payments. Consequently, for this reason alone, the plaintiff's allegations set out a legally viable claim for unjust enrichment.

3

**Quantum meruit (count 2)**

A claim for quantum meruit requires proof that the plaintiff rendered services to the defendant, that the defendant knew of and consented to those services, and that under the circumstances it is reasonable for the plaintiff to expect payment for those services. *Paffhausen*, 708 A.2d at 271. The jist of a quantum mertuit claim is the existence of an implied promise where the formal elements of an express contract do not exist. *Id.* at 272. A promise to pay or perform may be found "when the surrounding circumstances make it reasonable for him [the performing party] to believe that he will receive payment from the other." *Id.* (citation and punctuation omitted). The reasonableness of that belief flows from the performance of services "under circumstances consistent with contractual relations." *Id.* (citation and punctuation omitted). *See also Danforth*, 650 A.2d at 1335.

Here, Larkin alleges that it was in a direct and express contractual relationship with Manafort, the general contractor. The allegations do not support a claim that Maine Yankee was subject to an express or implied contractually based obligation to pay Larkin for its performance rendered as a result of Larkin's relationship with Manafort.

Larkin argues that language in several Law Court opinions supports its position that it may pursue a quantum meruit claim here. The first passage, from *A.F.A.B.,* 610 A.2d at 749, and discussed above, appears to be an instance where the Court made reference to "quantum meruit" but was actually examining a claim for unjust enrichment. *See Danforth*, 650 A.2d at 1335 n. 2 (noting that the *A.F.A.B.* Court used "unjust enrichment" and "quantum meruit" interchangeably). The second passage is from *Pendleton.* There, the Law Court referred to a holding from a Tennessee case: ". . .we [the Tennessee Supreme Court] hold that where a materialman or subcontractor furnishes labor or material which benefit the property of a person with whom there is no privity of contract, an action on quantum meruit may lie against the landowner to recover the reasonable value of said labor and materials so furnished." 297 A.2d at 894, *quoting Paschal's Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966). However, the Tennessee court went on to lay out the elements of the claim that it called "quantum meruit," *id.*, and those elements are the same as the elements for an unjust enrichment claim under Maine law. The Law Court went on to discuss some factors that would make a subcontractor's claim viable even in the absence of privity, in order "to prevent any 'enrichment' from

4

being 'unjust' . . . ." 297 A.2d at 895. This is suggestive of the analysis that supports a claim for the equitable remedy of unjust enrichment.

The court readily acknowledges that some of the older quantum meruit/unjust enrichment cases such as *A.F.A.B.* and *Pendleton* do not make it easy to distinguish between the legal analyses that is unique to each legal theory. However, this court's best attempts to make that distinction in those cases indicates that the caselaw noted by Larkin does not support its argument that, in the present circumstances, it may maintain a claim for quantum meruit. The language that appears facially to lend support to Larkin's claim in fact appears to bolster its contention that a claim for unjust enrichment may be proper. However, a close examination of the Law Court's analysis does not allow the concept of quantum meruit to be stretched to the degree necessary to survive Maine Yankee's motion to dismiss that claim.

### Negligent misrepresentation (count 3)

Maine Yankee next argues that the absence of contractual privity with Larkin bars Larkin from suing in tort. Specifically, Maine Yankee contends that it owes no duty that could have been breached as Larkin alleges. The absence of an express contract between the parties, and the absence of a claim based on an implied contract eliminates a contractual relationship as the source of any duty owed by Maine Yankee to Larkin. Because Larkin does not argue the existence of a statutory duty, the question becomes whether a common law duty of care exists between the parties.

The existence of a duty is a question of law. *Mastriano v. Blyer*, 2001 ME 134, ¶ 11, 779 A.2d 951, 954. The Law Court has identified several principles that are useful in determining whether a duty exists. A duty is "an obligation, to which the law will give recognition and effect, to conform to a particular manner of conduct toward another." *See Quadrino v. Bar Harbor Banking & Trust Co.*, 588 A.2d 303, 304 (Me. 1991) (citation omitted). More specifically, the court must consider the foreseeability of harm resulting from the defendant's conduct. *See Cameron v. Pepin*, 610 A.2d 279, 282 (Me. 1992); *see also Trusiani v. Cumberland & York Distributors, Inc.*, 538 A.2d 258, 263 (Me. 1988) (Scolnik, J., dissenting) (where a plaintiff is foreseeable, "a duty will exist if reasonable persons would recognize that it exists."). The relationship of the parties is also germane.

5

*See Hughes v. Beta Upsilon Building Association*, 619 A.2d 525, 527 (Me. 1993).
Additionally, fundamental policy implications must be weighed:

> In the decision of whether or not there is a duty, many factors interplay: the hand of history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of mores of the community 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.'

Id. (citations omitted). The creation and scope of such a duty, however, is circumscribed by the need to avoid "both unlimited liability and liability out of all proportion to culpability." *Cameron*, 610 A.2d at 283.

The Restatement of Torts imposes a duty of reasonable care on parties who obtain or provide false information to others in business transactions, when the injured party sustains pecuniary loss as a result of placing reasonable reliance on that information. RESTATEMENT (SECOND) OF TORTS § 552(1) (1977). Liability for such negligent misrepresentations in this context extends to losses suffered by those parties for whose benefit and guidance the respondent supplies the information, even in the absence of privity. *Id.*, comment h; *see also id.*, ill. 9. The court finds this analysis persuasive for two reasons.

First, Maine courts historically rely on the formulations of law found in the Restatement.

Second, exposure to liability for circumstances identified in section 552 is consistent with the basic principles used in Maine to determine when a common law duty exists. The existence of a duty places the burdens of loss on the party whose fault caused that loss. Although Maine Yankee argues that this allocation exposes it to risks that it otherwise avoided when it declined to enter into a contractual relationship with Larkin, in fact Maine Yankee is in the best position to eliminate the risks and resulting harm that its conduct allegedly caused here. In this way, a party in Maine Yankee's shoes continues to avoid liability simply by acting with due care. This leads to a separate justification for this duty, which is to provide an incentive to a supplier of information to take those reasonable steps that will reduce the risk of the pecuniary loss that would foreseeably be

6

sustained by consumers of that information. Finally, the limitations on liability embodied in section 552 ameliorate the concerns of unlimited liability. The universe of claimants is limited to those parties "for whose benefit and guidance he [the defendant] intends to supply the information or knows that the recipient intends to supply it. . . ." *Id.* at § 552(2)(a). Any liability is limited to damages arising from those transactions in which the liable party intends the defective information to be used. *Id.* at 552(2)(b). Finally, any recoverable damages are limited to pecuniary losses. *Id.* at 552(1).

Maine Yankee argues alternatively that even if a cause of action exists for negligent misrepresentation in the circumstances of this case, Larkin cannot recover because it knew that any representations made by Maine Yankee were false and did not rely on any such representations. The pleadings do not establish this factual contention, and it cannot bar Larkin's claim at this early stage of the proceedings.

**Wrongful refusal to approve submittals (count 5)**

In support of its claim in count 5, Larkin alleges as part of the bid process, Maine Yankee prepared construction drawings and technical specifications that would govern Larkin's prospective work as a subcontractor. Complaint at ¶ 11. Larkin further alleges that on the basis of those drawings and specifications, it submitted its own shop drawings and equipment and material submissions. *Id.* at ¶ 21. Later in the complaint, Larkin alleges that those submissions were filed with Maine Yankee and that Maine Yankee negligently refused to approve them. *Id.* at ¶¶ 51-52. Here, Larkin's contractual relationship was with Manafort, and Larkin does not pursue its claim against Maine Yankee in count 5 on any theory that is contractually based. Consequently, Maine Yankee argues that there is no remaining basis on which to impose a duty that would support this claim of actionable conduct. The analysis used to determine the existence of a common law duty of reasonable care is noted above.

Although the submittal process is not made entirely clear from the complaint, the pleading may be read to allege that Larkin was required to present certain submissions for Maine Yankee's approval and that this requirement originated with Manafort's relationship with Maine Yankee. In this way, the complaint may be read to contend that Maine Yankee inserted itself directly into Larkin's performance of its obligations under the Larkin-Manafort contract. Those circumstances justify an expectation in the law that

Maine Yankee will exercise reasonable care in its conduct that has a direct bearing on Larkin's ability to discharge its own obligations. As the court construes the allegations against Maine Yankee in count 5, this is far from a situation where the landowner is on the sidelines and plays little or no role in the performance of the subcontractor. Even though Maine Yankee's only contractual relationship is with Manafort, Maine Yankee elected to retain a substantial measure of control over the work required of Larkin. In assessing a claim brought by a contractor against an architect between whom there was not contract, one court has noted:

> Altogether too much control over the contractor necessarily rests in the hands of the supervising architect for him not to be placed under a duty imposed by law to perform without negligence his functions as they affect the contractor. The power of the architect to stop the work alone is tantamount to a power of economic life or death over the contractor. It is only just that such authority, exercised in such a relationship, carry commensurate legal responsibility.

*United States v. Rogers & Rogers*, 161 F.Supp. 132, 136 (S.D.Cal. 1058). *See also Forte Bros. v. National Amusements, Inc.*, 525 A.2d 1301, 1303 (R.I. 1987) (noting an "emerging majority" of jurisdictions allowing tort actions against supervising architects even in the absence of privity, and further holding, "A supervising architect, in the performance of its contract with the owner, is required to exercise the ability, skill and care customarily exercised by architects in similar circumstances. . . .This duty of care extends to contractors who share an economic relationship and community of interest with the architect on a construction project.").

Here, the allocation of power retained by Maine Yankee should not be accompanied by immunity from liability based on harm sustained by others who are required to have direct dealings with it, when Maine Yankee fails to exercise reasonable care in exercising that power.

**Breach of warranty (count 6)**

In the final count of its complaint, Larkin seeks recovery based on a claim that Maine Yankee breached express and implied warranties embodied in the specifications and drawings that it formulated and on which Larkin relied in submitting its bid to Manafort. Larkin also alleges that Maine Yankee breached a warranty that the latter would accept performance that satisfied those specifications.

8

As Judge Hand defined it.

> A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact . . .; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.

*Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d. Cir. 1946). The contractual foundation of a warranty formed the basis for dismissal of warranty claims made by a party who was not in privity with the alleged wrongdoer. *In re: All Maine Asbestos Litigation*, 581 F.Supp. 963, 973 (D.Me. 1984). Indeed, one of the cases cited by Larkin appears to equate contract and warranty claims. *Performance Abatement Services Inc. v. Lansing Board of Water and Light*, 168 F.Supp.2d 720, 734 (W.D.Mich. 2001).

Here, Larkin has not alleged the existence of an express contractual relationship with Maine Yankee, and for the reasons noted above, such a relationship cannot be implied in fact. Consequently, claims that are a function of the privity of parties necessarily are barred. This includes claims for breach of warranty, which arise out of a relationship that is not alleged to exist here.

The entry shall be:

For the foregoing reasons, defendant Maine Yankee's motion to dismiss is granted in part and denied in part. The plaintiff's claims against Maine Yankee for quantum meruit in count 2 and for breach of warranty in count 6 are dismissed for failure to state a claim upon which relief can be granted. Beyond this, the motion is denied.

Dated: September 12, 2002

_____
Justice, Maine Superior Court

9