2007 ME 125

**Priscilla REID**

v.

**TOWN OF MOUNT VERNON et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 17, 2007.

Decided: Sept. 4, 2007.

Sumner H. Lipman, Esq., Benjamin J. Smith, Esq. (orally), Lipman, Katz & McKee, P.A., Augusta, for plaintiff.

Mark V. Franco, Esq. (orally), Elizabeth K. Peck, Esq., Thompson & Bowie, LLP, Portland, (for Town of Mt. Vernon), Debra W. Ford, Esq., Elaine M. Michaud, Esq., Donald L. Smith, Esq. (orally), Devine, Millimet & Branch, P.A., North Hampton, NH, (for Waste Management of Maine, Inc.), Elizabeth A. Germani, Esq., Germani & Riggle, LLC, Portland, (for Clayton Reid), for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.*

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, JJ.

Dissent: SILVER, J.

ALEXANDER, J.

[¶ 1] Priscilla Reid appeals from summary judgments entered in the Superior Court (Kennebec County, *Marden, J.*) on her complaints, filed individually and as personal representative of the estate of her late husband, James Reid, against defendants Town of Mount Vernon (the Town), Waste Management of Maine, Inc. (Waste Management), and Clayton Reid. By those complaints, she asserts negligence in causing James Reid's death, for which she seeks damages in accordance with the Maine Tort Claims Act (MTCA), 14 M.R.S. §§ 8101–8118 (2006), and the Maine Wrongful Death Statute, 18–A M.R.S. § 2–804 (2006). Priscilla Reid argues that the court erred in its determination that no genuine issues of material fact exist with respect to her negligence claims. We affirm the judgments.

## I.  CASE HISTORY

[¶ 2] Most of the facts in this case are undisputed. Where factual disputes do exist, we view the facts in the light most favorable to the nonmoving party. *See River Dale Ass'n v. Bloss,* 2006 ME 86, ¶ 5, 901 A.2d 809, 811.

[¶ 3] On July 12, 2003, James Reid and his brother, Clayton Reid, traveled to the Town's transfer station in Clayton's pickup truck. The two brothers regularly went to the transfer station to dispose of trash.

When they arrived on July 12, James Reid got out of the truck to ask an attendant where they could dispose of a television set.

[¶ 4] The Town had a number of trash dumpsters at the transfer station, which were "almost flush" with the ground. James Reid removed orange pylons from in front of the first dumpster and motioned for Clayton Reid to back the truck up to the dumpster so that they could push the television from the truck into the dumpster. James stood outside the rear of the passenger side of the vehicle and directed Clayton in backing up his truck. Using his passenger-side mirror, Clayton watched James motioning and giving directions. Clayton had obscured visibility through his windshield rearview mirror because of the size of the television, and did not use his driver-side mirror to assist him while backing up. At the time he began backing up, the tailgate of the pickup truck was up.

[¶ 5] James motioned for Clayton to stop the truck. Clayton stopped the truck and shut off the engine. As Clayton was exiting the vehicle, he heard two thumps from the rear of his truck. He believes the thumps were the tailgate dropping down and James falling into the dumpster. Clayton walked to the tailgate, which he observed was now down. He also saw his brother lying at the bottom of the dumpster face down. James Reid died as a result of striking his head. Though the transfer station attendant was standing with James as Clayton began backing up his truck, he had turned to talk to another visitor at the transfer station and did not see the truck stop or James Reid fall. Therefore, there was no eyewitness to the accident.

---

* Justice Howard H. Dana Jr. sat at oral argument and participated in the initial conference but retired before this opinion was certified.

[¶ 6] At the time of the accident, Clayton Reid was aware that there were no safety chains or other devices in front of the dumpster. He had experience using the Town's transfer station and knew of the danger in backing up his truck to the dumpster.

[¶ 7] Previously, the Town had placed two chains attached to, and running the length of, the trash dumpster in question to prevent people from falling in. The chains began to break in 2002, and had been completely broken for approximately six months prior to the accident.

[¶ 8] Approximately three to six months before James Reid's fall, the attendant who was at the transfer station during the accident told the Town Selectmen at least twice at Selectmen meetings that the chains in front of the dumpster were no longer in place. The Town Selectmen told the attendant "they'd take care of it," but the chains were not repaired at the time of James Reid's fall.

[¶ 9] The dumpster that James Reid fell into was rented by the Town from Waste Management. In addition to renting trash bins and dumpsters, Waste Management regularly transported full dumpsters from the transfer station, disposed of the waste and debris deposited at the station, and returned the same or similarly sized dumpsters to the transfer station. Waste Management provided these services to the Town pursuant to an agreement entitled "Solid Waste Disposal and Hauling Agreement" (the Agreement). The Agreement contained a mutual indemnification provision which stated that the Town and Waste Management each agreed to hold the other harmless for negligent acts of their own employees.

[¶ 10] Waste Management has expertise in the field of trash hauling and disposal, and was responsible for placement, pickup, drop off, and installation of the dumpsters.

Most of the other transfer stations that Waste Management serviced at the time of the accident had safety measures, such as jersey barriers, ropes, signs, or chains, set up around or in front of their dumpsters.

[¶ 11] Priscilla Reid filed a complaint against the Town, Waste Management, and Clayton Reid, alleging that all three had negligently caused her husband's death. She sought damages individually, and as a personal representative of her husband's estate, pursuant to the MTCA, 14 M.R.S. § 8104–A, and the Maine Wrongful Death Statute, 18–A M.R.S. § 2–804. After lengthy discovery, all three defendants filed motions for summary judgment, which the court granted. This appeal followed.

## II. LEGAL ANALYSIS

[¶ 12] We review the grant of a motion for summary judgment de novo, "viewing the evidence in the light most favorable to the nonmoving party, to decide whether the parties' statements of material fact and referenced record evidence reveal a genuine issue of material fact." *River Dale Ass'n*, 2006 ME 86, ¶ 5, 901 A.2d at 811 (quoting *Rice v. City of Biddeford*, 2004 ME 128, ¶ 9, 861 A.2d 668, 670). "A material fact is one having the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "A genuine issue exists when sufficient evidence supports a factual contest to require a factfinder to choose between competing versions of the truth at trial." *Id.*

[¶ 13] When a motion for summary judgment, supported by a proper statement of materials facts, asserts that a claim is legally insufficient, the party opposing a summary judgment has the burden to establish a prima facie case for each element of their claim or defense in order

to avoid a summary judgment. *Reliance Nat'l Indem. v. Knowles Indus. Servs. Corp.,* 2005 ME 29, ¶ 9, 868 A.2d 220, 224–25.

[¶ 14] A prima facie case of negligence requires a plaintiff to establish four elements: duty, breach, causation, and damages. *Mastriano v. Blyer,* 2001 ME 134, ¶ 11, 779 A.2d 951, 954. The existence of a duty of care is a question of law, while issues of the breach of a duty of care are usually questions of fact. *Cf. Radley v. Fish,* 2004 ME 87, ¶ 6, 856 A.2d 1196, 1198–99; *Mastriano,* 2001 ME 134, ¶¶ 11–12, 779 A.2d at 954; *McPherson v. McPherson,* 1998 ME 141, ¶ 8, 712 A.2d 1043, 1045; *Carter v. Bangor Hydro–Elec. Co.,* 598 A.2d 739, 741 (Me.1991).

[¶ 15] Duty is a question of whether a defendant is under any obligation for the benefit of the plaintiff. *Trusiani v. Cumberland & York Distribs., Inc.,* 538 A.2d 258, 261 (Me.1988). Where a court imposes a duty in a negligence case, that duty is "to conform to the legal standard of reasonable conduct in the light of the apparent risk." *Id.* (quoting WILLIAM L. PROSSER & W. PAGE KEETON, PROSSER & KEETON ON TORTS § 53 at 359 (5th ed.1984)).

A. Clayton Reid's Motion for Summary Judgment

[¶ 16] Priscilla Reid argues that Clayton Reid owed a duty of care to his brother. This duty stemmed from his knowledge that there was an open dumpster that posed a hazardous condition, and from his backing up while James Reid was positioned between the vehicle and the dumpster. The facts presented show that James Reid directed Clayton Reid from outside the truck on the passenger side, and therefore, controlled the vehicle's placement. James Reid motioned to Clayton Reid to stop. He stopped the truck.

Clayton Reid then turned off the engine. As he exited his vehicle, he heard two thumps. He proceeded to the rear of the truck, where he observed that the tailgate was down and his brother was lying in the bottom of the dumpster.

[¶ 17] A driver of a vehicle owes a duty to "use due or ordinary care under the attendant circumstances," *Nadeau v. Fogg,* 145 Me. 10, 14, 70 A.2d 730, 732 (1950), and a duty to park in a legal and safe space, *Tenney v. Taylor,* 392 A.2d 1092, 1093 (Me.1978). We held in *Mastriano* that "absent a special relationship, the law imposes no duty to act affirmatively to protect someone from danger unless the dangerous situation was created by the defendant." 2001 ME 134, ¶ 17, 779 A.2d at 955. Clayton and James Reid's relationship as brothers does not constitute a "special relationship," and Priscilla Reid has not asserted any facts which show that Clayton Reid created the dangerous situation, operated his vehicle in an unsafe manner, or failed to park in a safe and legal place. Though Clayton Reid did have a duty to use ordinary care while driving, it was not until he had turned off the truck engine and exited the vehicle that he heard two thumps, which presumably were the tailgate falling open and James Reid falling into the dumpster.

[¶ 18] We have recognized that "the mere fact of the happening of an accident is not evidence of negligence." *Rice v. Sebasticook Valley Hosp.,* 487 A.2d 639, 641 (Me.1985). In addition, in *Green v. Cessna Aircraft Co.,* we affirmed a grant of summary judgment for the defendants where the trial court found that plaintiff's "experts' opinions amount to nothing more than speculation" as to the causation of an airplane crash at issue in the case, and the record was devoid of any facts to support

the experts' assumptions. 673 A.2d 216, 218 (Me.1996).

[¶ 19] In the present case, there were no eyewitnesses to James Reid's tragic fall. Priscilla Reid has failed to present us with a prima facie case, supported by her statement of material facts, as to how James's fall occurred and how Clayton Reid violated any duty in a manner that caused James's fall. *See Reliance Nat'l Indem.,* 2005 ME 29, ¶ 9, 868 A.2d at 224–25. James Reid could have placed himself in a precarious position behind the truck, he could have accidentally let down the tailgate, Clayton Reid could have backed up too close, or the tailgate could have fallen down by itself, knocking James Reid into the dumpster. Similar to *Green,* whether the facts presented show that any duty was violated when James Reid's accident occurred is no better than speculation. The facts do not establish a prima facie case for liability, and therefore, we affirm summary judgment in favor of Clayton Reid.

B. The Town's Motion for Summary Judgment

[¶ 20] Governmental entities are immune from suit pursuant to the MTCA, subject to specific, limited exceptions enumerated in section 8104–A. *Maynard v. Comm'r of Corr.,* 681 A.2d 19, 23 (Me.1996). Statutory exceptions to the doctrine of sovereign immunity must be strictly construed. *Id.*

[¶ 21] Priscilla Reid argues that the Town waived its sovereign immunity through the indemnification clause in the Agreement with Waste Management. In *Diamond International Corp. v. Sullivan & Merritt, Inc.,* we held that an indemnification clause contained in a contract, which clearly and specifically contained a waiver of immunity, could be sufficient to waive the immunity enjoyed by employers under the Workers' Compensation Act. 493 A.2d 1043, 1048 (Me.1985). The present case involves the MTCA, not the Workers' Compensation Act, and therefore, *Diamond International* is not controlling. Furthermore, the language contained in the indemnification clause in the Agreement between the Town and Waste Management is nothing more than a contractual agreement between two parties to hold each other harmless for the negligent acts of their own employees. It does not constitute a waiver of the Town's MTCA immunity to benefit a third party.

[¶ 22] Our opinion in *Adriance v. Town of Standish,* 687 A.2d 238 (Me.1996), addressing a MTCA claim for an injury at a transfer station also is of no help to Priscilla Reid's claim. The principal issue in *Adriance,* discretionary function immunity, *id.* at 239, is not at issue in this case. Furthermore, in *Adriance,* the transfer station was deemed a "public building" pursuant to 14 M.R.S. 8104–A(2). *Id.* at 240. It was "permanent, fully enclosed and completely open to the public." *Id.* The transfer station here is an open area with a portable trash hopper. It is not a building, and Priscilla Reid does not claim otherwise, basing her claim on the proposition that the dumpster was "machinery or equipment," listed in 14 M.R.S. § 8104–A(1)(G).

[¶ 23] A governmental entity will be liable for its negligent acts or omissions in the ownership, maintenance or use of any motor vehicle, special mobile equipment, trailer, aircraft, watercraft, snowmobile, as well as any "[o]ther machinery or equipment." 14 M.R.S. § 8104–A(1)(A) to (G). Our previous decisions give a narrow interpretation to the phrase "[o]ther machinery and equipment," and establish that dumpsters do not fall into that category.

[¶ 24] In *New Orleans Tanker Corp. v. Department of Transportation*, we recognized that the items listed in section 8104–A(1)(A) through (F) have certain similar characteristics: they are capable of transportation, mobile, likely to come into contact with the general public, constitute "fairly ordinary transportation devices with which people have a degree of familiarity," accidents with them are common, insurance is readily available, and they are not affixed to a permanent structure. 1999 ME 67, ¶ 8, 728 A.2d 673, 676. In order for a government entity to be liable for the negligent use or operation of "[o]ther machinery or equipment," however, the "*risk* from the negligent use of the 'other machinery or equipment' [must] be comparable to the risk that results from the negligent use of the vehicles listed in section 8104–A(1)(A) through (F)." *Id.* ¶ 6, 728 A.2d at 675 (emphasis added). The major risk from the negligent use of vehicles specifically enumerated in section 8104–A(1)(A) through (F) is that "they will be driven or transported in locations where the general public is exposed to the possibility of a collision and resulting harm." *Id.* ¶ 9, 728 A.2d at 676.

[¶ 25] Priscilla Reid argues that dumpsters share similar characteristics with the vehicles enumerated in section 8104(A)(1)(A) through (F) because they are capable of transportation, mobile, likely to come into contact with the general public, and are not affixed to a permanent structure. However, dumpsters do not have the power to move on their own, and certainly would not be considered "ordinary transportation devices." In addition, accidents with dumpsters are not nearly as common as accidents with vehicles, and dumpsters are unlikely to be insured.

[¶ 26] Finally, the complaint alleges negligence in the placement of the dumpsters and in the failure to maintain adequate safety measures around them. Without proper placement and safety precautions, there is a risk that someone could be injured from falling into, or backing a vehicle into, a dumpster. This differs significantly from the risk of injury associated with the vehicles listed in section 8104(A)(1)(A) through (F). The major risk posed by motor vehicles, aircraft, snowmobiles, etc. is that they will be negligently operated on public ways and collide with the public, resulting in personal injury or property damage. In contrast, the harm alleged in the present case did not result from a collision with the dumpster, but rather, from the use of a dumpster while in a fixed position.

[¶ 27] Because "[t]he Legislature did not intend the general phrase 'other machinery or equipment' ... to include all other possible machinery and equipment that is negligently owned or operated by a governmental unit and could therefore cause some form of personal injury or property damage," *New Orleans Tanker Corp.*, 1999 ME 67, ¶ 10, 728 A.2d at 676, we affirm summary judgment in favor of the Town.

C.  Waste Management's Motion for Summary Judgment

[¶ 28] Priscilla Reid argues that Waste Management owed James Reid a duty to reasonably and safely locate the trash dumpsters, and to ensure that the transfer station was operated in a safe manner. She contends this duty arises from both Waste Management's Agreement with the Town and a common law duty of care.

[¶ 29] "The interpretation of an unambiguous contract is a question of law." *Guilford Transp. Indus. v. Pub. Utils. Comm'n*, 2000 ME 31, ¶ 13, 746 A.2d 910, 914. Construing the Agreement between Waste Management and the Town in its plain, ordinary, and generally accepted meaning, *see Villas by the Sea Owners*

*Ass'n v. Garrity,* 2000 ME 48, ¶ 9, 748 A.2d 457, 461, we do not read it to hold Waste Management responsible for the maintenance of safety measures around the dumpsters.

[¶ 30] In the Agreement, Waste Management is required to indemnify the Town for any damages arising out of its "performance of [ ] work." Paragraph ten of the Agreement states that Waste Management "shall have exclusive control of and the exclusive right to control the details of the services and work performed." Priscilla's argument that these clauses create a duty of care presupposes that the "work" Waste Management performs includes the maintenance of adequate safety measures. Nowhere in the Agreement, however, does it state that the "work" Waste Management is to perform includes anything to do with safety.

[¶ 31] In addition, Priscilla Reid has offered no evidence that Waste Management and James Reid had a special relationship, or any evidence that the dumpster had been incorrectly placed in the earthen pit by Waste Management. Without more facts, Pricilla Reid has failed to create a genuine issue of material fact as to whether Waste Management owed James Reid a duty of care.

[¶ 32] Finally, Priscilla Reid argues that Waste Management is liable for James Reid's accident under a theory of negligent entrustment. In order to prevail on a negligent entrustment claim, a plaintiff must show that defendant had the right to control the property in question, which was entrusted to a third party, on the occasion when the accident occurred. *See Pelletier v. Mellon Bank, N.A.,* 485 A.2d 1002, 1004 (Me.1984).

[¶ 33] Though Priscilla Reid's complaint alleges that Waste Management was negli-

gent in its placement of the dumpsters flush with the ground and without adequate safety measures, it mentions nothing about Waste Management maintaining control over the dumpsters while they are located at the Town's transfer station. Priscilla Reid had the burden of setting forth a clear demand for the relief she sought in her initial complaint pursuant to M.R. Civ. P. 8(a). Because her complaint was insufficient to put Waste Management on notice of a negligent entrustment claim, the claim has not been preserved.

[¶ 34] Even if Priscilla Reid's claim of negligent entrustment was not barred by her failure to adequately plead it in her initial complaint, she has not offered evidence to create a genuine issue of material fact as to Waste Management's control over the dumpsters. Furthermore, the indemnification clause contained in the Agreement makes no mention of Waste Management maintaining control over the dumpsters or even servicing them while they are at the transfer station. Therefore, we affirm summary judgment in favor of Waste Management.

The entry is:

Judgments affirmed.

SILVER, J., dissenting.

[¶ 35] I agree with the Court's analysis surrounding Clayton and Waste Management, but I respectfully dissent from the Court's decision to affirm summary judgment in favor of the Town. Today's decision by the Court moves us further away from what the Legislature intended and leads to inconsistent and illogical applications of the statute. *See* 14 M.R.S. § 8104–A(2) (2006).[1]

[¶ 36] In *Adriance v. Town of Standish,* 687 A.2d 238–40 (Me.1996), we held that a town may be held liable pursuant to the public building exception for its negligent

1. Title 14 M.R.S. § 8104–A(2) provides:

2. Public Buildings. A governmental entity

failure to properly construct, operate or maintain a waste transfer station. In *Adriance,* much like in the instant case, an individual suffered injuries after falling into a trash hopper at the town's waste transfer station. *Id.* at 239. We concluded that the transfer station was a public building for the purposes of the Maine Tort Claims Act, and therefore, fell within an exception to sovereign immunity. *Id.* at 240.

[¶ 37] In *Adriance,* the claimant suffered injuries after falling into a trash hopper at the Town of Standish waste transfer station. *Id.* at 239. The station was a large garage-type structure containing an office and a trash hopper. *Id.* The trash hopper was surrounded by a concrete wall, except on the side of the back-up area. *Id.*

[¶ 38] The Court's holding today thus creates an anomalous result. If James Reid had fallen into a dumpster in Standish, for example, Priscilla would have been allowed to recover damages for the town's negligent failure to maintain a protective barrier around the dumpster. We should not construe the Legislature's words to produce absurd and manifestly unjust results. A patchwork of liability and immunity is simply not endorsed by the text and spirit of 14 M.R.S. § 8104–A.

[¶ 39] In the instant case, Reid fell into a dumpster flush with the ground. It does not make sense to have a policy allowing suit to proceed as a result of a fall into a partially open dumpster and not allow a suit to proceed when the dumpster is totally open. This distinction does not come from the statute, *see* 14 M.R.S. § 8104–A(2), but comes instead from this Court's interpretation of the statute. The Legislature did not intend for such inconsistent results, and it is the Court's duty to prevent illogical and absurd results as a result of our interpretation. *See Carroll v. Town of Rockport,* 2003 ME 135, ¶ 23, 837 A.2d 148, 155; *Brent Leasing Co. v. State Tax Assessor,* 2001 ME 90, ¶ 6, 773 A.2d 457, 459.

[¶ 40] By this decision, the Court is further confusing an already confusing area. The Town of Mount Vernon allowed a dangerous situation to continue for a significant period of time. However, if the same accident occurred with a partial concrete wall surrounding three sides of the dumpster area, this Court may have reached a different decision. This decision is not good public policy.

[¶ 41] Accordingly, I would vacate the trial court's grant of a summary judgment for the Town.

---

is liable for its negligent acts or omissions in the construction, operation or maintenance of any public building or the appurtenances to any public building. Notwithstanding this subsection, a governmental entity is not liable for any claim which results from:
  A. The construction, ownership, maintenance or use of:
    (1) Unimproved land;
    (2) Historic sites, including, but not limited to, memorials, as defined in Title 12, section 1801, subsection 5;
    (3) Land, buildings, structures, facilities or equipment designed for use primarily by the public in connection with public outdoor recreation; or
    (4) Dams;
  B. The ownership, maintenance or use of any building acquired by a governmental entity for reasons of tax delinquency, from the date of foreclosure and until actual possession by the delinquent taxpayer or the taxpayer's lessee or licensee has ceased for a period of 60 days; or
  C. The ownership, maintenance or use of any building acquired by a governmental entity by eminent domain or by condemnation until actual possession by the former owner or the owner's lessee or licensee has ceased for a period of 60 days.
14 M.R.S. § 8104–A(2)(2006).