STATE OF MAINE
CUMBERLAND, ss

WILLIAM AND CYNTHIA
DEXTER,

Plaintiffs

v.

EDWARD J. DRASBY, D.O.,
PORT CITY NEUROLOGY,
and LISA FALEY HOWARD,
Personal Representative of
the Estate of Richard Faley,

Defendants

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-11-508

STATE OF MAINE
Cumberland ss Clerk's Office

FEB 05 2016

RECEIVED

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

Before the court is defendants Edward Drasby and Port City Neurology's motion for summary judgment in plaintiffs William and Cynthia Dexter's medical malpractice action. For the following reasons, the court denies the motion.

## I.    FACTS

Defendant Edward Drasby, D.O., is a neurologist who specializes in the treatment of patients with movement disorders, including Parkinson's disease. (Supp. S.M.F. ¶ 2.) Dr. Drasby diagnosed Mr. Richard Faley with idiopathic Parkinson's disease on October 5, 2006. (*Id.* ¶ 1.) Dr. Drasby treated Mr. Faley for Parkinson's disease from this date until Mr. Faley's death in 2011. (*Id.* ¶ 3.) During this time period, Mr. Faley also suffered from other conditions, including atrial fibrillation, congestive heart failure, glaucoma, and uveitis.[1] (*Id.* ¶ 5.) As a result of his glaucoma, Mr. Faley had some loss of visual acuity and visual field loss in both eyes. (*Id.* ¶ 61.)

Dr. Drasby prescribed Mirapex as part of his treatment of Mr. Faley's Parkinson's disease. (*Id.* ¶ 12.) Mirapex is a dopamine agonist, which means it acts chemically in much the

---

[1] Uveitis refers to an array of diseases that have in common inflammation of the eye. (*Id.* ¶ 31.)

1

same way as dopamine, a neurotransmitter whose production is inhibited by Parkinson's disease. (*Id.* ¶¶ 4, 13.) Dr. Drasby gave Mr. Faley a Mirapex "starter kit" on November 3, 2006. (Opp. S.M.F. ¶ 20.) On November 30, 2006, Dr. Drasby instructed Mr. Faley to increase his dose of Mirapex to 0.6125 mg three times per day for one week, followed by 0.75 mg three times per day for two weeks, and then 1 mg three times per day after that. (*Id.*)

On December 10, 2007, Mr. Faley reported to Dr. Drasby that he was experiencing drowsiness, which is a side effect of Mirapex. (*Id.*; Supp. S.M.F. ¶ 17.) Specifically, he reported that he "wakes 3-5 a.m." and "falls asleep after each dose of Mirapex." (Opp. S.M.F. ¶ 20.) Dr. Drasby instructed Mr. Faley to take only 0.5 mg. (Supp. S.M.F. ¶ 23.) Despite this instruction, Mr. Faley continued to take 1 mg. (*Id.* ¶ 25.) Mr. Faley informed Dr. Drasby at an appointment on June 4, 2008 that he was taking 1 mg. (Pls.' Addt'l S.M.F. ¶ 15.) Dr. Drasby again instructed Mr. Faley to reduce his dose to 0.5 mg. (*Id.* ¶ 16.) However, Dr. Drasby continued to write a prescription for 1 mg so that Mr. Faley would not have to refill his prescription more frequently. (Supp. S.M.F. ¶ 24.) Dr. Drasby wrote a one-year prescription for 1 mg in June 2008, June 2009, and June 2010. (Pls.' Addt'l S.M.F. ¶¶ 17-18, 23.)

At an appointment on April 26, 2010, Mr. Faley again informed Dr. Drasby that he was taking 1 mg. (Supp. S.M.F. ¶ 38.) This time, Dr. Drasby advised Mr. Faley to continue taking 1 mg because it appeared to Dr. Drasby that Mr. Faley was doing well at that dose. (*Id.* ¶¶ 29, 48.) Dr. Drasby admits that Mr. Faley reported on April 26 that he "tired easily" and that fatigue was one of his main complaints. (*Id.* ¶¶ 40-41.) However, he asserts that Mr. Faley reported that he was not having any "somnolence or sedation." (*Id.* ¶ 39.) Plaintiffs dispute that Mr. Faley was doing well at the 1 mg dose and assert that Dr. Drasby wrote in his notes that fatigue was Mr. Faley's "over-riding complaint." (Opp. S.M.F. ¶ 39.) Plaintiffs further assert that Dr. Drasby discussed prescribing Mr. Faley a stimulant, which he declined. (Pls.' Addt'l S.M.F. ¶ 20.)

2

Approximately one week later, Mr. Faley called Dr. Drasby to report that he was feeling drowsy. (Supp. S.M.F. ¶ 49.) Dr. Drasby reminded Mr. Faley that he had experienced drowsiness at the 1 mg dose in the past and instructed Mr. Faley to return to the 0.5 mg dose. (*Id.* ¶ 50.) Dr. Drasby and Mr. Faley had no contact between this conversation and July 4, 2010. (*Id.* ¶ 52.)

On July 4, 2010, Mr. Faley struck Dr. William Dexter while Mr. Faley was driving. (*Id.* ¶ 69.) Dr. Dexter and a friend were riding bicycles single file along the edge of Route 113. (Pls.' Addt'l S.M.F. ¶¶ 2, 5.) Dr. Dexter suffered severe injuries, including multiple rib fractures, collapsed lungs, a torn rotator cuff, a fractured wrist, multiple small fractures in his neck and back, a fractured sacrum, a disarticulated pelvis, and a fractured right ankle. (*Id.* ¶ 7.) The parties dispute whether Mr. Faley's vehicle left his lane of travel. Dr. Drasby asserts that Mr. Faley did not leave his lane before, during, or after the accident. (Supp. S.M.F. ¶ 76.) Plaintiffs assert that the vehicle drifted before the accident and continued to drift afterward. (Opp. S.M.F. ¶ 76.)

The parties agree that neither Mr. Faley nor any member of Mr. Faley's family ever reported to Dr. Drasby that Mr. Faley was having difficulty driving. (*Id.* ¶ 65; Supp. S.M.F. ¶ 65.) They also agree that Mr. Faley never provided Dr. Drasby with a form from the Bureau of Motor Vehicles (BMV) regarding his Parkinson's disease. (Supp. S.M.F. ¶ 58; Opp. S.M.F. ¶ 58.) Dr. Drasby informs his patients that they will receive a form from the BMV asking if they have been diagnosed with Parkinson's disease, and that they should bring this form to his office, or to the office of their primary care physician, for completion. (Supp. S.M.F. ¶ 55.) After Dr. Drasby completes the form, the patient often is examined by neurologists at the direction of the BMV and undergoes road tests. (*Id.* ¶ 57.)

Mr. Faley's first appointment with Dr. Drasby after the accident occurred on August 26, 2010. (*Id.* ¶ 82.) At this appointment, Mr. Faley informed Dr. Drasby that he had continued to take 1 mg after his phone conversation with Dr. Drasby. (*Id.* ¶ 83.) Dr. Drasby asked Mr. Faley if

3

he had felt drowsy before the accident, and Mr. Faley responded that he had not. (*Id.* ¶ 84.) Mr. Faley reported that he had no memory of seeing anyone in front of him while he was driving and that "the next thing he knew he heard a bump against the front of his car." (*Id.* ¶ 82.) Dr. Drasby told Mr. Faley that he might have had a Mirapex-induced "sleep attack," which is a sudden onset of loss of awareness, without warning, comparable to an attack of narcolepsy. (*Id.* ¶¶ 86-88.) Dr. Drasby eliminated Mirapex from Mr. Faley's medication regimen at this appointment. (*Id.* ¶ 92.)

Dr. Drasby now asserts that the experience Mr. Faley described is "highly inconsistent" with a sleep attack. (*Id.* ¶ 89.) Dr. Drasby explains that he is now aware of evidence that contradicts the sleep attack theory, namely that Mr. Faley did not report loss of consciousness to the police, that his field of vision was limited by his eye pathology, and that he told the police he simply had not seen Dr. Dexter. (*Id.* ¶ 96.) Dr. Drasby further explains that he told Mr. Faley about the possibility of a sleep attack because he wanted to console Mr. Faley by giving him a reason to think he might not have been at fault. (*Id.* ¶ 88.) The parties agree that less than one percent of patients who take dopamine agonists suffer sleep attacks and that there is no evidence Mr. Faley had ever experienced a sleep attack before. (*Id.* ¶¶ 90-91.)

Mr. Faley next had an appointment with Dr. Drasby on September 16, 2010. (Pls.' Addt'l S.M.F. ¶ 24.) At this appointment, Dr. Drasby noted that Mr. Faley had had an "excellent response" to the elimination of Mirapex, and that his fatigue and drowsiness had improved. (*Id.*) Dr. Drasby continued to treat Mr. Faley until Mr. Faley's death in 2011. (Supp. S.M.F. ¶ 3.)

## II. PROCEDURAL HISTORY

Plaintiffs filed a notice of claim pursuant to the Maine Health Security Act on November 18, 2011. A panel hearing occurred on December 10, 2013. Plaintiffs filed a complaint on April 17, 2014 alleging four causes of action: negligence against Mr. Faley's estate, negligence against Dr. Drasby, negligence against Port City Neurology (Dr. Drasby's practice), and loss of

4

consortium against all defendants. Defendants Dr. Drasby and Port City Neurology moved for summary judgment on May 19, 2015. Defendant Lisa Faley Howard, as personal representative of Mr. Faley's estate, filed a response stating that she does not agree with all of the facts asserted in defendants' statement of material facts, and she reserves her right to dispute those facts at trial. Plaintiffs opposed the motion for summary judgment on July 14, 2015. A hearing on the motion was held on January 12, 2016.

## III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c). "To survive a defendant's motion for a summary judgment, the plaintiff must establish a prima facie case for each element of her cause of action." *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 9, 824 A.2d 48. "A prima facie case of negligence requires a plaintiff to establish four elements: duty, breach, causation, and damages." *Mastriano v. Blyer*, 2001 ME 134, ¶ 11, 779 A.2d 951. "Summary judgment is properly granted if the facts are not in dispute or, if the defendant has moved for summary judgment, the evidence favoring the plaintiff is insufficient to support a verdict for the plaintiff as a matter of law." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18. The court views the facts and any inferences drawn from those facts in the light most favorable to the non-moving party. *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 11, 974 A.2d 276.

### B. Negligence

Defendants offer six arguments in support of their motion for summary judgment. Three of these arguments challenge the existence of Dr. Drasby's duty. Specifically, defendants argue: (1) Dr. Drasby did not owe a duty to plaintiffs because plaintiffs are not Dr. Drasby's patients, (2) Dr. Drasby did not have a duty to warn Mr. Faley not to drive, and (3) Dr. Drasby did not

5

have a duty to report Mr. Faley to the BMV. The other three arguments challenge the sufficiency of plaintiffs' evidence regarding causation. Specifically, defendants argue there is insufficient evidence that: (1) the lack of warning to Mr. Faley not to drive was a proximate cause of Dr. Dexter's injuries, (2) the lack of a report to the BMV was a proximate cause of Dr. Dexter's injuries, and (3) that Mr. Faley's drowsiness even contributed to the accident.

### 1. Duty

"Duty involves the question of whether the defendant is under any obligation for the benefit of the particular plaintiff." *Maravell v. R.J. Grondin & Sons*, 2007 ME 1, ¶ 7, 914 A.2d 709 (quoting *Searles v. Trs. of St. Joseph's Coll.*, 1997 ME 128, ¶ 5, 695 A.2d 1206). "Although the ultimate determination of whether a party was negligent is ordinarily a question of fact . . . the existence of a duty and the scope of that duty are questions of law[.]" *Alexander v. Mitchell*, 2007 ME 108, ¶ 14, 930 A.2d 1016.

### a. Duty to Non-Patients

Defendants argue that Dr. Drasby did not owe a duty to plaintiffs because plaintiffs are not Dr. Drasby's patients. The parties direct the court to two cases that discuss a physician's duty to non-patients: *Joy v. E. Me. Med. Ctr.*, 529 A.2d 1364 (Me. 1987) and *Flanders v. Cooper*, 1998 ME 28, 706 A.2d 589. Defendants argue that *Flanders* controls this case, while *Joy* does not. Plaintiffs take the opposite view, and argue that *Joy* controls, while *Flanders* does not.

In *Joy*, defendant Charles Marston was treated for an eye abrasion at Eastern Maine Medical Center. 529 A.2d at 1365. The treatment involved placing an eye patch over one of Mr. Marston's eyes. *Id.* Shortly after this treatment, Mr. Marston collided with plaintiff Todd Joy while driving. *Id.* at 1364-65. Mr. Joy alleged that Eastern Maine Medical Center and one of its physicians negligently failed to warn Mr. Marston that he should not drive while wearing the eye patch. *Id.* at 1365. The Superior Court granted summary judgment in favor of defendants,

6

holding that "any duty to warn did not extend to Joy." *Id.* The Law Court reversed, and held that "when a doctor knows, or reasonably should know that his patient's ability to drive has been affected, he has a duty to the driving public as well as to the patient to warn his patient of that fact." *Id.* at 1366.

In *Flanders*, plaintiff Thomas Flanders' daughter sought treatment from Greater Brunswick Physical Therapy for a joint syndrome. 1998 ME 28, ¶ 2, 706 A.2d 589. Mr. Flanders brought a medical malpractice action against the physical therapist who treated her, claiming that the physical therapist had implanted in his daughter's mind false memories of sexual abuse perpetrated by Mr. Flanders. *Id.* The Superior Court dismissed his claim, and the Law Court affirmed, holding that "a health care professional whose negligent treatment of a patient induced false memories of sexual abuse by a third party" does not owe a duty to the third party. *Id.* ¶¶ 1, 3. The court distinguished *Flanders* from *Joy* on the ground that:

> [T]here was no allegation in *Joy* that the treatment for the eye abrasion was negligent. The warning about the risks of driving dealt only with the aftermath of the treatment. Thus, the recognition of the physician's duty to the driving public to warn the patient of the risks of driving did not implicate the treatment decisions of the physician.

*Id.* ¶ 6. The court further reasoned that "recognition of the duty Flanders advocates might restrict the treatment choices of health care professionals, and hence it would intrude directly on the professional-patient relationship." *Id.* ¶ 8.

Whether or not Dr. Drasby owed a duty to plaintiffs therefore turns on whether plaintiffs allege that Dr. Drasby's treatment of Mr. Faley was negligent, or if they allege that his failure to warn was negligent. If they allege the former, *Flanders* controls, and Dr. Drasby did not owe a duty to plaintiffs. If they allege the latter, *Joy* controls, and Dr. Drasby did owe a duty to plaintiffs. The record reveals that plaintiffs' allegations deal primarily with the aftermath of treatment. Plaintiffs allege that Dr. Drasby was negligent in failing to appropriately assess Mr.

7

Faley's ability to drive, failing to recognize that Mr. Faley's ability to drive was impaired, failing to recognize that Mr. Faley could not be relied upon to regulate his dose, failing to warn Mr. Faley not to drive, and failing to intervene to prevent Mr. Faley from driving. (Compl. ¶ 31.) These alleged failures arose after Dr. Drasby's treatment decision to prescribe Mirapex.

Although plaintiffs also challenge Dr. Drasby's decision to continue to prescribe 1 mg, an allegation arguably involving Mr. Faley's treatment, that allegation is secondary to plaintiffs' primary contentions regarding Dr. Drasby's alleged failure to warn Mr. Faley or otherwise prevent him from driving. *See Jordan v. Cap Quality Care, Inc.*, 2009 Me. Super. LEXIS 78, at *14 (Mar. 16, 2009) (holding that *Joy* applied because any argument that defendants were negligent in their treatment was secondary to plaintiffs' "primary contention" that they were negligent in their failure to warn). This is in contrast to *Flanders*, where Mr. Flanders challenged only the defendant's treatment and made no allegation of any failure to warn. *Joy* therefore controls this case, and the court finds that Dr. Drasby owed a duty to plaintiffs.

b. Duty to Warn

Defendants further argue that, even if there were a duty to non-patients, Dr. Drasby did not have a duty to warn in this case. *Joy* establishes a duty to warn when a doctor reasonably should have known that his or her patient's ability to drive has been affected. 529 A.2d at 1366. Dr. Drasby reasonably should have known that Mr. Faley's ability to drive had been affected by Mirapex because he was aware as early as December 10, 2007 that Mr. Faley was experiencing drowsiness at the 1 mg dose, and he was aware as early as June 2008 that Mr. Faley was continuing to take the 1 mg dose despite Dr. Drasby's instruction to lower the dose. Dr. Drasby was also aware in April 2010 that Mr. Faley was continuing to take the 1 mg dose and, in May 2010, that Mr. Faley was again experiencing drowsiness. These facts are sufficient to put Dr.

8

Drasby on notice that Mirapex had affected Mr. Faley's ability to drive, and the court therefore finds that Dr. Drasby had a duty to warn Mr. Faley.

Defendants counter that Dr. Drasby did not have a duty to warn because Mr. Faley already knew that Mirapex made him drowsy. The Law Court's reasoning in *Joy* makes clear that this argument is unavailing. In *Joy*, the defendants argued that the duty to warn did not apply because the dangers associated with wearing an eye patch are obvious. 529 A.2d at 1366. The court rejected that argument on the ground that, although it was obvious that an eye patch eliminates the use of one eye, the court could not assume that Mr. Marston understood that the eye patch affected his driving. *Id.* As a result, it was "possible that the accident resulted from some effect of the eye patch known to the physician, but unknown to the patient." *Id.*

Here, the trier of fact could find it was obvious that Mirapex caused Mr. Faley to be drowsy because he had repeatedly experienced that side effect. *See id.* ("The 'obvious' nature of the particular peril that may have caused [the] accident is a factual determination to be decided by the jury in fixing the standard of reasonable conduct under the circumstances."). However, even assuming that the drowsiness was obvious, there is no evidence that Mr. Faley understood that this drowsiness would affect his driving. To the contrary, one of plaintiffs' experts doubts that Mr. Faley "retained enough of his faculties" to understand that drowsiness could affect his driving. (Opp. S.M.F. ¶ 68.) Therefore, any knowledge Mr. Faley had that Mirapex caused drowsiness does not negate Dr. Drasby's duty.

c. Duty to Report to BMV

Defendants argue that Dr. Drasby did not have a duty to report Mr. Faley to the BMV because the relevant statutory provision does not require doctors to report impaired drivers.[2]

---

[2] That provision states: "A physician or other person who becomes aware of a physical, mental or emotional impairment that appears to present an imminent threat to driving safety and reports this

9

Essentially defendants argue that, because the legislature has not imposed a requirement that doctors report impaired drivers, no duty to do so exists. This argument overlooks the fact that a duty may arise from either statute or from the common law. *See MacDonald v. Hall*, 244 A.2d 809, 814 (Me. 1968) ("It is basic that due care requires the observance by one person of any duty imposed, by the common law or statute, for the safety of another."). *Joy* establishes that a doctor owes a duty to the driving public. 529 A.2d at 1366. Although that case concerned a doctor's duty to warn, a duty to report is consistent with *Joy*. In *Joy*, the court imposed a duty to warn at least in part out of concern for the safety of the driving public. *See id.* at 1365 (finding "no support in the law" for the Superior Court's implicit assumption that a doctor's duty to warn a patient for his or her safety does not extend to non-patients). A duty to report protects the safety of the driving public because it increases the likelihood that impaired drivers will be taken off the road. Further, unlike in *Flanders*, this duty does not implicate any treatment decisions and therefore does not intrude on the doctor-patient relationship, and it is also consistent with legislative intent. *See* 29-A M.R.S. § 1258(6) (providing immunity for those who report impaired drivers). Therefore, the court finds that Dr. Drasby had a duty to report Mr. Faley to the BMV.

2. Causation

Proximate cause exists when the "evidence and inferences that may reasonably be drawn from the evidence indicate that the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence." *Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778 (citation omitted). "The question of whether a defendant's acts or omissions were the proximate cause of a plaintiff's injuries is generally a question of fact, and a judgment as a

information to the Secretary of State in good faith is immune from criminal or civil liability for so doing." 29-A M.R.S. § 1258(6) (2015).

10

matter of law is improper if any reasonable view of the evidence could sustain a finding of proximate cause." *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757. Each case turns on its own facts, and the trier of fact "must apply its ordinary human experience to the facts revealed by the evidence." *Ames v. Dipietro-Kay Corp.*, 617 A.2d 559, 561 (Me. 1992). Nevertheless, a defendant is entitled to summary judgment "if there is so little evidence tending to show that the defendant's acts or omissions were the proximate cause of the plaintiff's injuries that the jury would have to engage in conjecture or speculation in order to return a verdict for the plaintiff." *Houde*, 2001 ME 183, ¶ 11, 787 A.2d 757.

### a. Lack of Warning to Mr. Faley

Defendants argue that plaintiffs have not generated a genuine issue as to whether a warning from Dr. Drasby to Mr. Faley would have prevented the accident. Plaintiffs have produced evidence that, in other cases in which Dr. Drasby believed a patient's ability to drive was impaired, he would instruct the patient to stop driving.[3] (Pls.' Addt'l S.M.F. ¶ 34.) A reasonable view of this evidence is that Dr. Drasby's warning to patients at least could cause them to stop driving. Although it is true that Mr. Faley cannot testify as to whether he personally would have heeded a warning from Dr. Drasby, the court finds that this evidence is sufficient to withstand summary judgment, given that the court views all inferences in the light most favorable to plaintiffs, and that proximate cause is generally a question of fact.

---

[3] There is also relevant testimony from Mr. Faley's family at the panel hearing, however, the admissibility of this testimony is unclear. The Maine Health Security Act provides:

> The findings and other writings of the panel and any evidence and statements made by a party or a party's representative during a panel hearing are not admissible and may not otherwise be submitted or used for any purpose in a subsequent court action ... except that ... The party who made the statement or presented the evidence may agree to the submission, use or disclosure of that statement or evidence.

24 M.R.S. § 2857(1)(A) (2015). It is unclear whether the family members who provided this testimony have agreed to its use, and therefore the testimony's admissibility is also unclear.

### b. Lack of Report to BMV

Defendants further argue that plaintiffs have not generated a genuine issue as to whether reporting Mr. Faley to the BMV would have prevented the accident. Defendants concede that, if Dr. Drasby had reported Mr. Faley to the BMV, it is reasonable to infer that the BMV would have required Mr. Faley to undergo a driving test, but they argue that there is no evidence that Mr. Faley would have failed this test. Viewing this inference in the light most favorable to plaintiffs, a reasonable view of the evidence could sustain a finding that Mr. Faley would have failed a driving test. Mr. Faley was experiencing drowsiness, and plaintiffs' experts assert that this drowsiness impaired his ability to drive. Specifically, the experts claim that Mr. Faley's "problems . . . would certainly raise concerns about his ability to drive at least by 2009 and probably before that" and that if somebody "can't remain awake while they're driving, obviously that's unsafe." (*Id.* ¶¶ 42, 45.) Dr. Drasby also states that he would have reported Mr. Faley on August 26, 2010 if Mr. Faley had not already given up driving, (*id.* ¶ 38), which suggests that a report may have eliminated Mr. Faley's driving privileges. The trier of fact could reasonably conclude, based on this evidence and his or her ordinary human experience, that Mr. Faley would have failed a driving test, and that proximate cause therefore exists between Dr. Drasby's decision not to report and Dr. Dexter's injuries.

### c. Drowsiness

Defendants' final argument is that plaintiffs have not generated a genuine issue as to whether Mr. Faley's drowsiness, as opposed to his vision or other issues, caused the accident. The parties' experts have presented different theories regarding the cause of the accident. Plaintiffs' experts assert that it is an "important possibility" that the accident happened because Mr. Faley "was drowsy secondary to the side effects of Mirapex" and also that there is a "very good chance" that drowsiness played a role in the accident. (*Id.* ¶¶ 56-57.) They further assert

12

that there was "nothing about Faley's vision that contributed to the car accident." (*Id.* ¶ 65.) Defendants' experts counter that Mr. Faley's eye disease inhibited his perception of Dr. Dexter and that it is "unknowable" whether Mr. Faley fell asleep before the accident. (Supp. S.M.F. ¶¶ 79-81.) The jury must determine which of these theories it finds most credible. *See Warren v. Waterville Urban Renewal Auth.*, 235 A.2d 295, 305 (Me. 1967) ("The competence, credibility and weight of expert testimony is exclusively the province of the jury.").

In addition, Dr. Drasby himself suspected at the August 26 appointment that the accident was due to a Mirapex-induced sleep attack. (Supp. S.M.F. ¶ 86.) To the extent that Dr. Drasby now asserts that he did not actually suspect this, (*id.* ¶¶ 88-89), this apparent change of position further supports the existence of a genuine issue as to whether Mr. Faley's drowsiness played a substantial part in the accident. Therefore, the issue of proximate cause with regard to whether Mr. Faley's drowsiness caused the accident must go to the trier of fact.

## IV.    CONCLUSION

The court hereby ORDERS that defendants Edward Drasby and Port City Neurology's motion for summary judgment is DENIED.

Pursuant to M.R. Civ. P. 79(a), the clerk is directed to incorporate this Order by reference in the docket.

Dated: _Feby 5, 2016_

Roland Cole
Chief Justice, Superior Court

13