STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss                          CIVIL ACTION
                                        DOCKET NO. CV-09-149
                                        $R \, L \, c \, - \, C \, u \, \wedge \, - \, 3$

N. DENIS HAWKESORTH AND
CYNTHIA S. VAIL
        Plaintiffs
                                        ORDER ON DEFENDANT
                                        DARYL NORTON'S MOTION
v.                                      FOR SUMMARY JUDGMENT

B&M CONSTRUCTION CO.,
DARYL NORTON, ET AL.,
        Defendants

## BEFORE THE COURT

Defendant Daryl Norton ("Norton") files this Motion for Summary
Judgment on Plaintiffs N. Denis Hawkesworth's and Cynthia Vail's claims
against Norton for negligence (Count XIX), negligent infliction of emotional
distress (Count XX), and breach of contract (Count XXI), pursuant to M.R. Civ. P.
56.

## BACKGROUND

Plaintiffs' claims arise from alleged construction defects and deficiencies
in a home Defendants built for the Plaintiffs. On March 13, 2009, Plaintiffs filed a
twenty-seven count Complaint naming as Defendants B&M Construction
Company, RTG, Inc., Robert Blackburn, Thomas Blackburn, Gordon T. Holmes,
Jr., d/b/a Direct Real Estate, Coleman Walsh, Daryl Norton, and Joshua Marr
d/b/a J. Marr Roofing & Siding. Plaintiffs' claims against Norton pertain to
water penetration into the home. Plaintiffs claim the water damage caused dry
rot to sheathing, siding and structural members of the house; caused water

1

damage to sheetrock, insulation, and the interior finish; and caused the production of mold and mold spores throughout the house.

At all relevant times, Defendant Robert Blackburn was the sole owner and president of B&M Construction. B&M Construction was formed for the purpose of building houses. Robert Blackburn was also the sole owner and president of RTG, Inc., a company that was in the business of buying land. On or about September 25, 2001, B&M entered into a purchase and sale agreement with the Plaintiffs whereby B&M would construct a home on land owned by RTG, and the property would be transferred to the Plaintiffs by Warranty Deed upon completion of the home.

Defendant Norton operated a sole proprietorship, D.S. Norton Construction (collectively, "Norton"). On or about November 25, 2001, Norton entered into a subcontract with B&M to perform work on Plaintiffs' home. The scope of the subcontract between Norton and B&M was for Norton to provide framing, ceiling strapping, rough interior and exterior stairs, exterior wall sheathing, roofing, siding, wall partitions, cabinet blocking, and window and door installation for B&M Construction. Robert Blackburn, in his role as B&M Construction's owner, president, and general contractor supervised Norton's work. Norton also had a verbal agreement with Robert Blackburn to perform the interior trim work, including windows, doors and mop boards, as well as constructing the finished stairs, railings, newel posts, treads and risers.[1]

Norton began working on the project on or about November 26, 2001. According to Norton, his work at the project, including all change orders, was

---

[1] Plaintiffs state that the verbal agreement was apparently with B&M Construction because Norton invoiced B&M for the work. Pl.'s Opp. S.M.F. ¶ 10.

finished by May 10, 2002. Norton contends that the Plaintiffs entered into no additional agreements with Blackburn, RTG, or B&M Construction after the closing and that no additional work was performed other than repairs. In contrast, Plaintiffs claim that Norton returned to the home on several occasions after May 10, 2002 to do corrective work. The Town of Falmouth issued a certificate of occupancy to RTG, Inc. on May 7, 2002. The closing for Plaintiffs' home and land took place on June 10, 2002, when they purchased the house from B&M Construction and RTG. Norton contends that if the home was not completed to Plaintiffs' satisfaction they did not need to close on the home. The Plaintiffs moved into the house in July 2002. Plaintiffs claim that the closing on the purchase of the home was subject to an Addendum Agreement executed in June 2002, which required B&M Construction and RTG to complete certain work and to extend certain warranties to the Plaintiffs.[2] Plaintiffs claim the Addendum Agreement imposed an obligation on B&M Construction, Robert Blackburn, RTG, and their subcontractors. The Addendum Agreement does not mention subcontractors or specifically mention Norton, and Norton is not a

---

[2] The Addendum Agreement provides:
6.  Sellers agree that their contractual obligations with respect to the design and construction of the Buyers' home and site work shall survive the closing of the real estate transaction under the Agreement and that all work completed or to be completed by Sellers shall be governed by the following warranty obligation which obligation shall also survive the closing of the real estate transaction under the Agreement:

> In addition to any additional warranties agreed to by the parties, Sellers warrant that the work will be free from faulty materials; constructed according to the standards of the building code applicable for this location; constructed in a skillful manner and fit for habitation or appropriate use. The warranty rights and remedies set forth in the Maine Uniform Commercial Code apply to this contract.

signatory to the Addendum. Norton contends that the Addendum does not impose any obligations on subcontractors.

Norton claims that Plaintiffs never had a contract with him and that he was at all times a subcontractor hired by B&M. Norton claims that Plaintiffs never directly paid him for any work on the project or for any repair or warranty work after the Plaintiffs moved in. Norton also claims that he was never hired to perform any extra work or side projects that were not within the scope of Norton's and B&M's subcontract. Plaintiffs state that prior to July 2002, they never had a direct, written contract with Norton, and that they never delivered payment to Norton for any of the work he performed on the project. Additionally, Plaintiffs state that they contacted Daryl Norton in order to have him perform corrective work after they moved into the house.

Plaintiffs state that when they moved into the home in July 2002 it was in excellent condition. The parties dispute the dates on which Plaintiffs became aware of certain defects in the home.[3] Norton claims that as early as September 2002, Plaintiffs were aware of a leak in the flat roof above the entranceway. However, Plaintiffs claim that they did not experience any problems with leaks from the roof until 2004.

One of the leaks is related to the roof design in the area of the dormer windows. This area commonly had ice damming and ice build-up on the roof along the soffits, and around the dormers. Norton contends that Plaintiffs were

[3] A year or two after Plaintiffs moved in a pipe above the garage burst. Plaintiffs claim it burst due to a failure to properly insulate the pipes. Norton contends that the pipe in the garage froze because the Plaintiffs had their garage door open all day when it was negative ten degrees and breezy outside. Def.'s Reply to Pl.'s Opp. S.M.F. p. 10, ¶ 17.

4

aware of the ice damming as early as the winter of 2002/2003, whereas Plaintiffs contend there was no ice damming until 2004. Norton contends that Robert Blackburn commented to Plaintiffs about a potential problem with the roof design in the area of the dormers before Plaintiffs moved in, but Plaintiffs never followed up about this problem, never asked anyone to fix it, and assumed it was taken care of. Plaintiffs claim that Robert Blackburn led the Plaintiffs to believe that the problem with the roof design would be fixed. Norton contends that the last time he returned to Plaintiffs' home was in the winter of 2002/2003 when he went to examine the ice damming and ice build-up in the area between the dormer and the main house. Three years after moving in, cracks in the ceiling of the master bedroom appeared, and Plaintiffs noticed a water spot forming on the ceiling above the front door. In December 2008, Plaintiffs first became aware of a mold problem in their house. Plaintiff Hawkesworth had respiratory problems for two years, but did not relate the symptoms to mold exposure until after air quality testing was conducted.

Plaintiffs allege that on numerous occasions they contacted Norton in order to secure necessary repairs and corrective work. Norton contends he was only contacted three times by Plaintiffs through Robert Blackburn. Plaintiffs allege that on numerous occasions from July 2002 to 2008, when Norton came to their property to respond to complaints about defects in the construction of the home, he would attempt to make repairs to the house to eliminate the defects. Plaintiffs allege that Norton indicated that he had taken care of all defects and deficiencies in workmanship and materials that were causing the problem. Plaintiffs allege that based on Norton's representations, it was their understanding that he had done the necessary work to correct the problems and

5

that they would have no further problems. Plaintiffs allege that in the fall of 2008, they hired another contractor to respond to the ongoing problems of water penetration into the home, which were causing leaks in the foyer area. Plaintiffs claim that Norton did not weatherproof the house and that this failure to weatherproof the house caused mold contamination.[4] Norton claims that when he performed warranty work at Plaintiffs' home he never made any misrepresentations about what he had done. Plaintiffs contend that Norton concealed the nature and extent of his defective work.[5]

Count XIX of Plaintiffs' Complaint alleges Norton was negligent in breaching a duty to safeguard Plaintiff's property from injury or damage, to conform to the legal standard of conduct in light of the apparent risks, and to construct Plaintiffs' residence in a competent and skillful fashion, which caused Plaintiffs to suffer and continue to suffer damages.

Count XX of Plaintiffs' Complaint alleges Norton negligently inflicted emotional distress on the Plaintiffs by creating an unreasonable risk of emotional, psychological and physical harm and distress to Plaintiffs, causing Plaintiffs to suffer and continue to suffer severe physical, emotional, and psychological damage.

---

[4] Plaintiffs state in their Memorandum in Opposition to Norton's Motion for Summary Judgment that "it was determined that [their] home was not water tight, that inappropriate and improper flashing had been installed in the home, that the attic had been improperly ventilated, and that as a consequence of the water penetration there had been extensive damage to the siding, sheathing, and structural members of the home." Pl.'s Opp'n to Norton's Mot. Summ. J. at 4.

[5] Plaintiff's provide further detail in their Memorandum in Opposition to Norton's Motion for Summary Judgment stating, "Daryl Norton did not disclose the fact that windows were installed without flashing, that flashing was improperly installed at roof lines, that the attic space was inadequately ventilated, and that the siding, roofing, windows and doors were not installed in a weather-tight fashion." Pl.'s Opp'n to Norton's Mot. Summ. J. at 12.

Count XXI of Plaintiffs' Complaint alleges Norton breached his contract by agreeing to perform corrective work on Plaintiffs' residence between July 2002 and 2008 and failing to perform the corrective work in a competent and workmanlike fashion.

Norton contends in his Motion for Summary Judgment that (1) Plaintiffs' claims are barred by the statute of limitations, (2) Plaintiffs have no breach of contract claim because they were not third-party beneficiaries to the contract between Norton and B&M Construction, (3) Plaintiffs never contracted with Norton subsequent to closing on their home and property because there was no consideration, and (4) Plaintiffs claims for negligence and negligent infliction of emotional distress must fail because there is no tort liability pursuant to the economic loss doctrine.

## DISCUSSION

### I. Standard of Review

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. M.R. Civ. P. 56(c). In considering a motion for summary judgment, the court should consider the facts in the light most favorable to the non-moving party, and the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. *E.g., Johnson v. McNeil*, 2002 ME 99, ¶ 8, 800 A.2d 702, 704. A contested fact is "material" if it could potentially affect the outcome of the suit under the governing law. *Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745, 747. A fact is "genuine" if there is sufficient evidence supporting the claimed fact to require a fact-finder to choose between competing versions of facts at trial. *Id.* For the purposes of summary

7

judgment, factual disputes and ambiguities must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 8, 694 A.2d 924, 926.

## II.    Breach of Contract Claim

Norton seeks summary judgment on Plaintiffs' Breach of Contract claim asserting: (1) there was no contract between Plaintiffs and Norton because there was no consideration, and (2) that Plaintiffs were not third party beneficiaries to the contract between Norton and B&M Construction. Plaintiffs state they are only claiming breach of contract with respect to Norton's promises to perform corrective work after the Plaintiffs moved into their house. Plaintiffs have acknowledged that their breach of contract and breach of warranty claims for damages related to the initial construction of the home are asserted against B&M only. Pl.'s Opp. to Def.'s Mot. Summ. J. at 13.

A contract is only "legally enforceable if it is founded upon a meeting of the minds, consideration, and mutuality of obligation," *In re Estate of McPhee*, 2006 ME 38, ¶ 7, 904 A.2d 401, 402. In this case, there was no contract between Plaintiffs and Norton. Plaintiffs never had a written agreement with Norton, Plaintiffs never delivered payment to Norton, and Norton never billed Plaintiffs for any of the repair or warranty work that he performed after they moved into their house. Pl.'s Opp. S.M.F. ¶ 21. The only contractual relationship Norton entered into with respect to Plaintiffs' home was with B&M construction. Because there was no consideration, there was no contract between Plaintiffs and Norton.

8

Additionally, Plaintiffs were not third party beneficiaries to the contract between Norton and B&M construction. The Restatement (Second) of Contracts provides the guiding law on third party beneficiaries. According to the Restatement:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
>> (a) The performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>>
>> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (1981). In order to be third party beneficiaries to Norton's contract with B&M, Plaintiffs must show that Norton or B&M intended for Plaintiffs to receive an enforceable benefit under the contract. *Devine v. Roche Biomedical Lab*, 659 A.2d 868, 870 (Me. 1995). Generally, a homeowner is not an intended third party beneficiary to a contract between the principal contractor and a subcontractor. 9 Corbin on Contracts § 45.3 (2009). Such contracts are made to enable the principal contractor to perform. *Id.* It is not enough that Plaintiffs benefited or could have benefited from the performance of Norton's and B&M's contract. *Id.* "The intent must be clear and definite, whether it is expressed in the contract itself or in the circumstances surrounding its execution." *Id.* The Plaintiffs are only incidental beneficiaries because nothing in the record evidences that Plaintiffs were intended to be third party beneficiaries to the contract between Norton and B&M. "An incidental beneficiary cannot sue to enforce third party beneficiary rights." *Id.*

Because there was no contract between the Plaintiffs and Norton and because Plaintiffs were not third party beneficiaries between Norton and B&M's contract, Plaintiffs breach of contract claims fail. Additionally, because the court finds that no contractual relationship existed, the court does not need to address the applicability of the economic loss doctrine. *Oceanside at Pine Point Condominium Owners Assoc. v. Peachtree Doors, Inc.*, 659 A.2d 267, 270 (Me. 1995) (stating that the effect of the economic loss doctrine is to limit a party to contractual remedies to compensate for purely economic losses).

### III. Plaintiff's Negligence Claims

Plaintiffs allege that Norton was negligent in breaching "a duty to safeguard Plaintiff's property from injury or damage, to conform to the legal standard of conduct in light of the apparent risks and to construct Plaintiffs' residence in a competent and skillful fashion." Pl.'s Compl. ¶ 153. Plaintiffs allege that Norton was "negligent in installing the windows without flashing, in allowing water to penetrate the home, in failing to properly install flashing in the roof to prevent water penetration and in failing to properly ventilate the attic." Pl.'s Opp'n to Def's Mot. Summ. J. at 5. Plaintiffs claim Norton's negligence caused "water penetration into the home causing dry rot to sheathing, siding and structural members of the house, damage to sheetrock, damage to insulation, and water damage to [the] interior finish." *Id.* The water damage caused a mold problem in Plaintiffs' home. Additionally, Plaintiffs allege negligent infliction of emotional distress and claim Norton's negligence caused Plaintiffs to suffer severe physical, emotional, and psychological damage. In particular, Plaintiff Hawkesworth claims he has respiratory problems related to mold exposure.

Plaintiffs have alleged that Norton is liable in tort for negligence and negligent infliction of emotional distress. To survive a motion for summary judgment a plaintiff must establish a prima facie case for each element of his cause of action that is challenged. *Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 9, 742 A.2d 933, 938. A plaintiff need not establish a prima facie case for those elements of a cause of action not challenged by the defendant. *Id.* A prima facie case of negligence requires a plaintiff to establish a duty owed, breach of that duty, and an injury to the plaintiff that is proximately caused by a breach of that duty. *Mastriano v. Blyer*, 2001 ME 134, ¶ 11, 779 A.2d 951, 954. In this case, the existence of a duty between Plaintiffs and Norton was questioned during the motion hearing. In order for Plaintiffs' negligence claims to survive summary judgment, it must be shown that Norton owed Plaintiffs a duty of care. "The existence of a duty is a question of law." *Id.* "The common law test of duty is the probability or foreseeability of injury to the plaintiff." *Colvin v. A R Cable Services-ME, Inc., d/b/a Cablevision*, 1997 ME 163, ¶ 7, 697 A.2d 1289, 1291. "A duty is an obligation, to which the law will give recognition and effect, to conform to a particular conduct toward another." *Mastriano*, at ¶ 12, 779 A.2d at 954. Whether a party breached a duty is usually a question of fact. *Stanton v. Univ. of Maine System*, 2001 ME 96, ¶ 11, 773 A.2d 1045, 1050.

The Court concludes Norton owed a duty of care to the Plaintiffs in this case. For example, if an electrician subcontractor installing wiring in a home failed to ground the wiring, and the homeowner was electrocuted by the defective wiring, this Court would find that such an injury was foreseeable, giving rise to a duty of reasonable care. Similarly, despite being slightly attenuated, it is reasonably foreseeable that failing to properly install windows

11

and waterproof a home would cause water damaged and mold contamination such that a homeowner could become sick.

Issues of fact regarding Norton's negligence preclude the Court from granting Norton's Motion for Summary Judgment, including: Norton's breach of his duty to Plaintiffs, causation, and the extent of the damages as discussed below. These issues will have to be resolved at trial.

IV.    Statute of Limitations

Norton contends that Plaintiffs tort claims are barred by the statute of limitations. Because there is no contract between Plaintiffs and Norton, the Court only addresses the statute of limitations with respect to Plaintiffs' negligence claims. Title 14 M.R.S. § 752 provides, "all civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards . . . except as otherwise specially provided." 14 M.R.S. § 752. "Generally, a cause of action accrues when a party suffers a judicially cognizable injury." *Dunelawn Owners' Ass'n v. Gendreau*, 2000 ME 94, ¶ 11, 750 A.2d 591, 595 (internal citations omitted). "[A] cause of action in tort usually accrues at 'the point at which a wrongful act produces an injury for which a potential plaintiff is entitled to seek judicial vindication.'" *Dugan v. Martel*, 588 A.2d 744, 746 (Me. 1991) citing *Williams v. Ford Motor Co.*, 342 A.2d 712, 714 (Me. 1975).

In this case, Plaintiffs cause of action accrued on the date on which Norton's defective work caused them injury. Norton alleges that his initial construction work on Plaintiffs' home was completed in May of 2002. Plaintiffs moved into their home on July 10, 2002. Pursuant to the rules of accrual, all of the tort claims for the initial construction of the home accrued at the time the home was completed. *Dunelawn*, at ¶ 12, 750 A.2d at 595. Plaintiffs contend that

12

Norton visited their home on numerous occasions between July 2002 and 2008 to perform repair and warranty work. Norton contends that the last time he performed work on the Plaintiffs home was during the winter of 2002/2003. Plaintiffs filed their Complaint against Norton March 13, 2009. Plaintiffs' claims regarding Norton's negligent construction of the home prior to March 13, 2003 are barred by the statute of limitations. Plaintiffs' claims relating to work performed on or after March 13, 2003 are not barred. The dates and the extent of Norton's work after March 13, 2003 remains an issue of fact.

Estoppel

To the extent that Plaintiffs' claims would be barred by the statute of limitations, Plaintiffs argue that Norton should be equitably estopped from arguing that their claims are barred by the statute of limitations.

> The gist of an estoppel barring the defendant from invoking the defense of the statute of limitations is that the defendant has conducted himself in [a] manner which actually induces the plaintiff not to take timely legal action on a claim. The plaintiff thus relies to his detriment on the conduct of the defendant by failing to seek legal redress while the doors of the courthouse remain open to him.

*Hanusek v. Southern Maine Medical Ctr.*, 584 A.2d 634, 636 (Me. 1990) citing *Townsend v. Appel*, 446 A.2d 1132, 1134 (Me. 1982). The Plaintiffs argue that equitable estoppel should apply because Norton came to Plaintiffs' residence on numerous occasions to repair the construction defects, and that the Plaintiffs received assurances that all the defects either had been or would be corrected. Plaintiffs claim that based on Norton's visits and assurances they did not pursue legal action, and that they did not learn that Norton lied until 2008.

The acts of the Plaintiffs in reliance on the Defendant's conduct must be reasonable. *Townsend*, 446 A.2d at 1133-34. The Plaintiffs must show that they

13

relied upon the conduct of the Defendant to their detriment because it induced them to do what they otherwise would not have done. *Id.* The means that when asserting equitable estoppel to overcome the statute of limitations the Plaintiffs must present evidence that shows they in fact intended to seek legal redress on their claims during the prescriptive period, and were induced to act otherwise as a result of the Defendant's conduct. *Townsend*, 446 A.2d at 1134. In this case, Plaintiffs admitted they first sought legal counsel with respect to the problems they were having with their home in November 2008. Moreover, Plaintiffs have not presented evidence that they intended to seek legal redress only to delay bringing an action as a result of Norton's representations. *See Hanusek*, 584 A.2d at 638 ("This is not the case of a misleading statement made shortly before the expiration of the limitations period prompting a brief delay in bringing suit."). Plaintiffs are not able to assert equitable estoppel to overcome the statute of limitations because they have not asserted facts to support their claim that Norton's conduct caused them to refrain from pursuing legal action.

Fraudulent Concealment

Plaintiffs also assert that the statute of limitation should be tolled by 14 M.R.S. § 859, which provides:

> If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto . . . the action may be commenced at any time within six years after the person entitled thereto discovers that he has a just cause of action.

14 M.R.S. § 859. In order for Plaintiffs to claim the benefit of section 859, they must establish either that Norton actively concealed material facts from them and that they relied on Norton's acts and statements to their detriment, or that a special relationship existed between the parties that imposed a duty to disclose

on Norton. *McKinnon v. Honeywell Int'l, Inc.*, 2009 ME 69, ¶ 15, 977 A.2d 420, 426. Norton claims that section 859 does not apply because Plaintiffs never asserted fraud and have failed to present with specificity clear and convincing evidence of fraud. Norton's contention misstates the law. "A plaintiff may invoke section 859 if either the defendant has fraudulently concealed from the plaintiff the existence of a cause of action or the plaintiff's claim is itself grounded on fraud." *Chiapetta v. Clark Assoc.*, 521 A.2d 697, 700 (Me. 1987). Plaintiffs allege Norton fraudulently concealed negligent construction work. Pl.'s Opp. to Def.'s Mot. Summ. J. at 11. Genuine issues of fact exist regarding the number of times Norton visited Plaintiffs' home, the extent of the work Norton performed, and the representations made by Norton. The applicability of 14 M.R.S. § 859 remains an issue of fact. If Plaintiffs can show that Norton fraudulently concealed the defects, then the statute of limitations may be tolled.

## DECISION

Therefore, the entry is:

Norton's Motion for Summary Judgment on Plaintiffs' contract claims is GRANTED. Because Norton owed Plaintiffs a duty of care, Norton's Motion for Summary Judgment on Plaintiffs' claims of negligence and negligent infliction of emotional distress are DENIED.

At trial, Plaintiffs will have to prove Norton was negligent, and that as a result Norton caused Plaintiffs' home to become contaminated with mold. Unless Plaintiffs can show that Norton fraudulently concealed defective work, Plaintiffs claims related to the original construction defects are barred by the statute of limitations. If the original construction defect claims are barred, Plaintiffs claims will be limited to Norton's repair work conducted on or after

15

March 13, 2003. Plaintiffs will have the burden at trial to differentiate between defective work conducted before March 13, 2003, and defective work conducted after that date. The jury verdict form will have to be structured in a way that poses the issue of fraudulent concealment as a threshold issue since the resolution of that question will drive the determination of liability and damages.

Dated at Portland, Maine this _____ day of _____, 2010.

_____
Robert E. Crowley
Justice, Superior Court